# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MELISSA FAY HELEN BROWN,

            Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

            Defendant.

_____/

Case No. 1:16-cv-00776-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.      INTRODUCTION

On June 3, 2016, Plaintiff Melissa Fay Helen Brown ("Plaintiff") filed a complaint under 42 U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her applications for Supplemental Security Income ("SSI") payments and Disability Insurance Benefits ("DIB"). (Doc. 1.) The matter is currently before the Court on the parties' briefs,

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017). She is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

## II.     BACKGROUND

Plaintiff was born on July 2, 1974, completed the eighth grade, and previously worked as a home attendant.[3]  (Administrative Record ("AR") 41, 71-72, 212.)  On June 26, 2012, Plaintiff filed a claim for DIB and SSI payments, alleging that she became disabled on January 1, 2009, due to inflammatory arthritis, cervical disc disease, fibromyalgia, irritable bowel syndrome, lumbar myofascial pain syndrome, asthma, borderline intellectual functioning, and anxiety disorder.  (AR 18, 212-224.)

**A.     Relevant Medical Evidence[4]**

**1.     Rheumatologist—H. Gill, M.D.**

In November 2011, Plaintiff presented to her rheumatologist, H. Gill, M.D., at Adventist Health Central Valley Network with neck pain, anxiety, insomnia, and generalized pain, including pain in her hands.  (AR 474.) H. Gill, M.D. noted fibromyalgia and tender points, and prescribed pain medication.  (*Id*.)

Plaintiff returned in January 2012, and, although she still had neck pain and issues related to rheumatoid arthritis and fibromyalgia, Plaintiff reported that she "feels much better."  (AR 473.)  However, in February 2012, Plaintiff reported that her pain had worsened.  (AR 472.)  Dr. H. Gill diagnosed rheumatoid arthritis, fibromyalgia, and neck pain.  (*Id*.)

Dr. H. Gill evaluated Plaintiff again in March, June, and October 2012, and January, February, March, and May 2013.  (AR 465-71.)  Each time, Dr. H. Gill diagnosed rheumatoid arthritis and fibromyalgia.  (*Id*.)

**2.     Pain Specialist—J.R. Grandhe, M.D.**

In June 2012, Plaintiff presented at Central Valley Pain Management for an initial pain

---

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 9.)
[3] Plaintiff also previously worked as a restaurant hostess and a sales clerk at Walgreens, but the Administrative Law Judge found the one-month duration of each of those jobs to be too brief to consider.  (AR 72.)
[4] As Plaintiff's assertions of error are limited to the Administrative Law Judge's analysis of Plaintiff's fibromyalgia and his discrediting of Plaintiff's testimony regarding the intensity of her pain and symptoms, only evidence relevant to those arguments is set forth below.

management consultation and evaluation by J.R. Grandhe, M.D., a pain specialist. (AR 368.) Plaintiff complained of neck pain with headaches, radicular pain into her bilateral shoulders, and localized low back pain. (*Id*.) Plaintiff described the neck pain as moderate to severe, the arthritis pain as severe, and she rated her average pain level as "7/10". (*Id*.) Plaintiff reported suffering headaches every day, with associated nausea, vomiting, weakness, and visual disturbances. (*Id*.)

Dr. Grandhe reviewed an October 2011 MRI of Plaintiff's cervical spine, and observed maxilliary sinus disease, and mild degenerative changes of the cervical spine but without any significant spinal canal stenosis or neuroforaminal narrowing, spinal cord compression or nerve root impingement at any imaged level. (AR 368.) Dr. Grandhe examined Plaintiff and noted bilateral suprascapular tenderness, spinous process tenderness, paraspinal tenderness, bilateral occipital tenderness, thoracic spine tenderness, restrictions in her cervical and lumbar spine, and the presence of trigger points. (AR 369.)

Dr. Grandhe diagnosed Plaintiff with chronic neck pain with bilateral radiculopathy secondary to multilevel cervical degenerative disc disease, bilateral occipital neuralgia with headaches, bilateral suprascapular neuralgia, chronic low back pain secondary to possible lumbar defenerative disc disease, and cervical, thoracic, and lumbar myofascial pain syndrome. (*Id*.) Dr. Grandhe recommended bilateral suprascapular nerve block and bilateral occipital nerve block immediately, a Transcutaneous Electrical Nerve Stimulation ("TENS") unit immediately, cervical epidural steroid injections in the future, lumbar spine x-rays to rule out disc and facet pathology, continued medication management, a home therapy program, and cervical, lumbar, and thoracic trigger point injections in the future. (*Id*.)

In July 2012, Plaintiff returned to Central Valley Pain Management for a follow-up evaluation. (AR 373.) Dr. Grandhe noted an "excellent response for two weeks" to the bilateral occipital nerve block and bilateral suprascapular nerve block Plaintiff underwent on May 12, 2012, but that Plaintiff returned to the emergency room on July 4, 2012, with excruciating pressure. (*Id*.) Dr. Grandhe assessed Plaintiff's pain level at the time of the July 2012 examination to be "3/10," and recommended Plaintiff receive diagnostic cervical epidural steroid

injections in eight to twelve weeks, and continue home therapy and medication.  (*Id.*)

In September 2012, Dr. Grandhe examined Plaintiff, and noted the presence of cervical, thoracic, lumbar, and sacroiliac joint tenderness, and trigger points in the cervical and thoracic area.  (AR 371.)  Dr. Grandhe diagnosed Plaintiff with myofascial pain syndrome of the cervical and thoracic areas, and sacroiliac anthropathy bilaterally.  (*Id.*)  "Due to the severity of pain," Dr. Grandhe recommended Plaintiff receive cervical, thoracic, and bilateral sacroiliac injections immediately, and he recommended that Plaintiff continue home therapy and medications.  (*Id.*)

### 3. Pulmonologist—K. Gill, M.D.

In October 2009, Plaintiff presented to a pulmonologist, Kuldeep Gill, M.D., at St. Agnes Medical Center for an evaluation in connection with her asthma.  (AR 295.)  Dr. K. Gill diagnosed Plaintiff with a left lower nodule, asthma, and possible Raynaud's disease.  (AR 296.)

In 2011, Plaintiff stopped seeing Dr. K. Gill because of problems with her health insurance.  (AR 20.)  Instead, on several occasions over the subsequent two years, Plaintiff presented at the emergency room at St. Agnes Medical Center.  On July 27, 2013, Plaintiff presented at the emergency room complaining of chronic right-sided flank pain.  (AR 684.)  It was noted that Plaintiff was suffering from abdominal pain, diarrhea, back pain, and neck swelling. (AR 684.)  Plaintiff received a Toradol injection, which Plaintiff reported made her feel better.  (AR 687.)  Plaintiff presented at the emergency room on October 16, 2013, complaining of chronic back pain, which had worsened that morning.  (AR 593.)  It was noted that Plaintiff was suffering from mild lumbar and thoracic scoliosis (AR 595), and Plaintiff was prescribed pain medication, (AR 605).  On November 30, 2013, Plaintiff presented at the emergency room with a bifrontal-to-vertex headache, nausea, and vomiting.  (AR 740.)  Plaintiff was prescribed Imitrex and Zofran.  (AR 741.)  On December 25, 2013, Plaintiff presented at the emergency room with a chronic cough and associated symptoms.  (AR 707.)  It was noted that Plaintiff was suffering from chest pain, shortness of breath, back pain, (AR 707), scoliosis, and "a questionable vague density in the right upper lobe which is small overlying the anterior 3rd rib," (AR 726).  On May 4, 2014, Plaintiff presented at the emergency room with a chronic cough and chest pain. (AR 864.)  On June 9, 2014, Plaintiff presented at the emergency room with an exacerbation of

chronic pain in her neck, back, and head. (AR 828.) Plaintiff was prescribed pain medication. (AR 837.) Finally, on August 12, 2014, Plaintiff presented at the emergency room, and she was diagnosed with a lung nodule and rheumatoid arthritis. (AR 815.)

In August 2014, Plaintiff resumed seeing and receiving treatment from Dr. K. Gill. At that time, Dr. K. Gill evaluated Plaintiff in connection with her asthma and rheumatoid arthritis. (AR 582.) Plaintiff complained of chest tightness and issues with her lung nodules. (AR 579.) Dr. K. Gill diagnosed Plaintiff with rheumatoid arthritis and assessed a new nodule in Plaintiff's left lower lobe. (AR 582.) Dr. K. Gill noted that Plaintiff was taking methotrexate, which is used for rheumatoid arthritis, and instead put Plaintiff back on a Qvar inhaler and recommended that she receive a pneumococcal and flu shot. (*Id.*)

### 4. State Agency Physician—K. Quint, M.D.

On June 18, 2013, Plaintiff's medical records were reviewed by K. Quint, M.D., a non-examining state agency physician. (AR 117.) Dr. Quint concluded that Plaintiff had the residual functional capacity to lift and carry up to 20 pounds occasionally and 10 pounds frequently. (AR 121.) Dr. Quint further concluded that Plaintiff could sit, stand, and walk six hours in an eight-hour workday, and she could occasionally climb, balance, stoop, kneel, crouch, and crawl. (AR 121, 124.) Dr. Quint stated that Plaintiff should avoid concentrated exposure to fumes, odor, dust, gases, and poor ventilation, and even moderate exposure to hazards such as heights and machinery. (AR 121, 124.)

## B. Administrative Proceedings

The Commissioner denied Plaintiff's application for SSI and DIB initially on November 6, 2012, and again on reconsideration on June 26, 2013. (AR 91-108, 126-38.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 162-64.) At the hearing on September 16, 2014, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 16, 33-77.)

### 1. Plaintiff's Testimony

Plaintiff testified that she suffers from cervical and lumbar disc disease in her neck and back. (AR 44-45, 52.) Plaintiff testified that she suffers from heart problems, which cause her

chest pain, and for which she visits a doctor once a year. (AR 55.) Plaintiff further testified that she suffers from rheumatoid arthritis, scoliosis, asthma, irritable bowel syndrome ("IBS"), and fibromyalgia. (AR 44-45.)

Plaintiff described feeling "really bad pain" at the time of the hearing. (AR 46.) "I always have the back pain," Plaintiff testified, "[t]hat doesn't go away." (AR 47.) Plaintiff described swelling in her neck for which she applies ice and shock therapy "a couple/three times a day." (AR 46.) Plaintiff also described feeling pain in her hips, knees, elbows, hands, and shoulders. (*Id.*) The ALJ asked, "And your pain, how often is it present?," to which Plaintiff answered "I'm always hurting." (AR 47.) Plaintiff testified that the pain is made worse "[i]f I try to overdo it, if I bend wrong or something I have to go to the hospital and they give me the medicines and they help me." (AR 47.) Plaintiff testified that she has been to the hospital four or five times during the past year. (*Id.*) The doctors tell her "there's nothing they can do except give me a lot of pain medicine and tell me to rest." (*Id.*)

With regard to her fibromyalgia, Plaintiff testified, "[I]t gives me real . . . bad pain everywhere kind of achy and just it's really hard sometimes. I get real achy everywhere and I'm getting nodules they're going to take off and I got a nodule in my lung that they're watching real close. In my left lung they said." (AR 49.) Plaintiff testified that she takes pain medication "probably once a day, sometimes two," and that the medication "help me not have the intense—the real bad pain." (AR 48.) Plaintiff testified that she participates in a pain management clinic once every two weeks, and "they give me the shots in my neck and spine, but they only seem to work a little bit." (AR 48-50.) Plaintiff testified that she also applies a TENS unit to her neck, "then I'll put an ice pack on and lay there for a while and it seems to help." (AR 50.) Plaintiff testified that she takes methotrexate—"the light chemo pills"—once a week. (AR 51, 61.) The methotrexate pills cause the Plaintiff nausea and dizziness, and after taking them, she "ha[s] to lay down for a day or two." (AR 51.)

Plaintiff testified that she has suffered from asthma for "a couple of years maybe." (AR 53.) She testified that she experiences shortness of breath daily. (AR 53-54.) Plaintiff described, "When I do things, get too active, I have . . . to lay down and calm down and take an

inhaler . . . Even taking a shower I have to have a shower chair to sit down to take a shower.  I can stand up, but if I start getting dizzy or shortness of breath, just—I sit down on it and finish." (*Id*.)  Plaintiff testified that she uses one inhaler daily and one for emergencies, and that they "seem to help."  (AR 53-54.)  Plaintiff testified that she visits a doctor about her asthma once a month.  (AR 54.)  Plaintiff testified that she does not use any oxygen or breathing apparatus. (*Id*.)

The ALJ then questioned Plaintiff about her daily activities.  Plaintiff testified that she cooks two or three times per week.  (AR 55.)  The ALJ asked Plaintiff how her children are fed, and Plaintiff replied, "We get microwave things like the microwave burritos and cereal and stuff like that.  Then the church will come and bring some stuff sometimes and Tuesdays [the children] go to Awana."  (AR 56-57.)  Plaintiff's children help with the dishes, but she tries to "do a little bit unless I'm having a bad day because I do have worse days and better days."  (AR 56.)  Plaintiff testified that her children also help her vacuum, mop, and do the laundry.  (*Id*.) The ALJ asked Plaintiff whether Plaintiff can do any household cleaning, and Plaintiff replied that she "wipe[s] the counters sometimes."  (*Id*.)  Plaintiff testified that she can shop for groceries.  (AR 57.)  Plaintiff testified that she leaves the house only to go to the grocery store, doctor's appointments, the pharmacy, and church.  (*Id*.)

The ALJ further questioned Plaintiff about her physical limitations.  The ALJ asked Plaintiff, "How long can you sit?"  (AR 58.)  Plaintiff testified that she could sit comfortably for "maybe 45 minutes/an hour, but I can't even move—move around."  (*Id*.)  The ALJ asked Plaintiff, "And after you sit for 25 minutes, what do you have to do then?"  (AR 60.)  Plaintiff replied, "I try to lay down and try to get comfortable . . . [for] [p]robably an hour—45 minutes to an hour."  (*Id*.)  Plaintiff testified that she can stand long enough to shop for groceries— "probably an hour.  I will lean on my basket when I shop and then it makes it easier to."  (AR 59.)  The ALJ clarified his question: "I'm just talking standing, not walking."  (*Id*.)  Plaintiff stated, "Oh, I don't know.  Maybe a few minutes.  I—I try to sit down . . . five/six minutes maybe I start getting uncomfortable to just sit down."  (*Id*.)  Plaintiff testified that she can walk "maybe 40 minutes.  On my bad days, I can't walk at all."  (*Id*.)  When asked how much she can

lift, Plaintiff testified that she cannot lift "very much at all," "[n]ot even the water bottles." (*Id*.) Plaintiff testified that she can lift a gallon of milk, "but I have to put it down." (AR 60.)

Plaintiff was then questioned by her attorney. Plaintiff testified that on the bad days, she remains in her nightgown and mostly just lies in bed. (AR 61.) Plaintiff testified even on typical days, she lies down "[a]lmost all the time when I'm at home." (AR 62.) With regard to Plaintiff's IBS, Plaintiff complained that she "gets really bad cramps" in her abdomen. (AR 62-63.) Plaintiff testified that she suffers IBS "about four times a week," and on those days she has to use the restroom "probably about five or six times" for about 20 minutes each time. (AR 63-64.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a home attendant, Dictionary of Operational Titles ("DOT") code 354.377-014, which was medium work, with a specific vocational preparation ("SVP") of 3. (AR 71-72.)

The ALJ posed a series of hypothetical questions to the VE. In the first hypothetical, the ALJ asked the VE to consider a person of Plaintiff's age, whose reading and writing skills are at a fourth-grade level, and who has past work as a home attendant. (AR 73.) Given those considerations, the ALJ asked the VE whether such a person would be capable of performing light working with the following limitations: "occasionally climbing ramps and stairs; balancing, stooping, kneeling, crouching, and crawling; no climbing ropes, ladders, and scaffolds; no working around unprotected heights or moving mechanical parts and no commercial driving; [] avoid concent[rated] exposure to fumes, dust[], odor gases, poorly ventilated areas, and chemicals; [ ] understanding, remembering, and carrying out simple, routine, repetitive tasks; using judgment limited to simple, work-related decisions." (*Id*.) The VE testified that such a hypothetical person could perform the following light exertional work: (1) assembler, SVP of 2, DOT code 712.687-010, of which there exists 220,000 jobs nationwide; and (2) packer, SVP 2, DOT 920.687-082, of which there exists 300,000 jobs nationwide. (AR 74.)

The ALJ asked a second hypothetical considering the same person and limitations

8

outlined in the first hypothetical, but with the added limitation of sedentary work only. (AR 74.) The VE testified that such a person could perform the following sedentary work: (1) assembler, SVP of 2, DOT 713.687-018, of which there exists 28,000 jobs nationwide; (2) packer, SVP 2, DOT 559.687-014, of which there exists 21,000 jobs nationwide; and (3) sorter, SVP of 2, DOT 521.687-086, of which there exists 13,000 jobs nationwide. (*Id*.)

The ALJ then posed a third hypothetical question to the VE, considering the same person and limitations outlined in the first hypothetical, but with the following additional limitations: the inability to sit for more than 25 minutes before needing to lay down for one hour; the inability to stand for more than five minutes at a time; the inability to walk more than 40 minutes at a time; the inability to lift more than eight pounds. (AR 75.) The VE testified that there would be no work such a person could perform. (*Id*.) The VE testified that her testimony was consistent with the DOT. (*Id*.)

Plaintiff's attorney then asked the VE to consider such a person as outlined in the first hypothetical but with the added need to access a restroom four to five times during an eight-hour work shift. (AR 75.) The VE testified that there would be no work for such a person. (*Id*.) Plaintiff's attorney asked the VE to consider such a person as outlined in the first hypothetical but who would also be absent from work for two to four days per month. (*Id*.) The VE testified that there would be no work for such a person. (AR 75-76.)

**C.      The ALJ's Decision**

In a decision dated December 4, 2014, the ALJ found that Plaintiff was not disabled. (AR 13–32.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 17–25.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since June 26, 2012, the application date. (AR 18.) The ALJ found that Plaintiff had the severe impairments of inflammatory arthritis, cervical disc disease, lumbar myofascial pain syndrome, asthma, borderline intellectual functioning, and anxiety disorder. (*Id*.) The ALJ found that Plaintiff's fibromyalgia and irritable bowel syndrome, however, were not severe impairments. (*Id*.) The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 ("the Listings"). (*Id.*) The ALJ determined that Plaintiff had the RFC

> to perform a light range of exertional work. She is capable of occasionally climbing ramps and stairs, and occasionally balancing, stooping, kneeling, crouching and crawling. The Claimant is precluded from climbing ladders, ropes, or scaffolds, working around unprotected heights or moving mechanical parts, and she is precluded from commercial driving. She should avoid concentrated exposure to fumes, dust, odors, chemicals or pulmonary irritants. The claimant is able to understand, remember, and carry out simple routine repetitive tasks. She is limited to using judgment for simple work-related tasks.

(AR 20.)

The ALJ found that Plaintiff had no past relevant work. (AR 25.) The ALJ determined, given her RFC, Plaintiff was not disabled because she could perform a significant number of other jobs in the local and national economies, specifically assembler and packer. (AR 26.) In reaching his conclusions, the ALJ further determined that Plaintiff's testimony about "the intensity, persistence and limiting effect of [the alleged] symptoms are not entirely credible for the reasons explained in this decision." (AR 25.) In particular, the ALJ stated the following with regard to Plaintiff's credibility:

> I considered the claimant's allegations and complaints, and while sincere in her testimony, the evidence does not support a finding of disability . . . She has testified to chronic, severe pain throughout her body, despite scant objective clinical findings, and an active lifestyle that is inconsistent with such complaints. The claimant has not required surgery or hospitalization, and does not require an assistive device for ambulation. [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(AR 25.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on March 30, 2016. (AR 1-5.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

**D.    Plaintiff's Appeal**

On June 3, 2016, Plaintiff filed a complaint before this Court seeking review of the ALJ's

decision. (Doc. 1.) Plaintiff argues that the ALJ erred in two respects: (1) the ALJ prematurely terminated the disability analysis at Step Two regarding Plaintiff's fibromyalgia; and (2) the ALJ failed to articulate sufficient reasons for finding that Plaintiff's testimony regarding her pain and symptoms was not entirely credible. (Doc. 1 at 17, 19.)

### III. SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec*., 528 F.3d 1194, 1198 (9th Cir. 2008).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

### IV. APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological

abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.    DISCUSSION

In her Opening Brief, Plaintiff contends that the ALJ erred in two respects. First, according to Plaintiff, the ALJ prematurely terminated the disability analysis as to Plaintiff's fibromyalgia at Step Two. (*See generally* Doc. 16 at 17.) Defendant counters that although the ALJ did not find Plaintiff's fibromyalgia to be severe, the ALJ continued the five-step analysis and took all of Plaintiff's impairments into consideration, including her fibromyalgia. (*See generally* Doc. 20 at 6.) Second, Plaintiff argues that the ALJ failed to articulate sufficient

reasons for discrediting Plaintiff's testimony regarding her pain and symptoms. (*See generally* Doc. 16 at 19.) Defendant counters that the ALJ's credibility determination about Plaintiff's subjective complaints of disability is supported by substantial evidence in the record. (*See generally* Doc. 20 at 7.)

## A. The ALJ's Consideration of Plaintiff's Fibromyalgia

In his decision, the ALJ found at Step Two of the five-step sequential analysis that Plaintiff's fibromyalgia was "medically determinable, but non-severe." (AR 18.) Plaintiff claims that the ALJ improperly terminated his analysis of Plaintiff's fibromyalgia at Step Two. In particular, Plaintiff contends that the record sufficiently details how Plaintiff's fibromyalgia has affected her such that it is a severe impairment, and that the ALJ's finding that Plaintiff's fibromyalgia would have a minimal effect on her ability to work is not supported by the record. (AR 18-19.)

### 1. Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, the ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Vasquez*, 572 F.3d at 591. The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [she] has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection. *Id*.

At the Second Step, the ALJ must determine whether the claimant has a medically determinable physical or mental impairment or combination of impairments that is severe and that meets the durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable

impairment is one which results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(D); *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005). A claimant's own statement of symptoms is not enough to establish a medically determinable impairment. 20 C.F.R. §§ 404.1508, 416.908.

An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). An impairment is not severe if it is a slight abnormality that has no more than a minimal effect on an individual's ability to do basic work activities. Social Security Ruling ("SSR") 96-3p. The purpose of Step Two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. *Bowen v. Yuckert*, 482 U.S. 137 (1987). "The step two inquiry is a de minimis screening device to dispose of groundless claims. *Smolen v. Chafer*, 80 F.3d 1273, 1290 (9th Cir. 1996). The burden is on the claimant to demonstrate a severe impairment. *Tackett*, 180 F.3d at 1098.

If an ALJ finds one severe impairment exists at the Second Step, all medically determinable impairments must be considered in the remaining steps of the sequential analysis. *Smolen*, 80 F.3d at 1290; 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523, 416.945(a)(2). When an ALJ accounts for resulting limitations later in the sequential process, any error in finding the impairment non-severe at the Second Step is harmless. *Lewis*, 498 F.3d at 911; *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005).

**2. The ALJ Did Not Terminate the Five-Step Analysis Regarding Plaintiff's Fibromyalgia at Step Two.**

In arguing that the ALJ erred at the Second Step by finding Plaintiff's fibromyalgia non-severe, Plaintiff misunderstands the function of the Second Step as a gate-keeping mechanism to dispose of groundless claims. Once a claimant prevails at the Second Step, by achieving a finding of some severe impairment, regardless of which condition is found to be severe, the ALJ proceeds with the sequential evaluation, considering at each step all other alleged impairments and symptoms that may impact the claimant's ability to work. *See* 42 U.S.C. § 423(d)(2)(B) ("In

determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."). Here, Plaintiff prevailed at the Second Step. Therefore, any error in the Second Step was harmless because the ALJ found six severe impairments (inflammatory arthritis, cervical disc disease, lumbar myofascial pain syndrome, asthma, borderline intellectual functioning, and anxiety disorder), and continued with the remaining steps.[5] *See generally Lewis*, 498 F.3d 909 (concluding that the ALJ's classification of one of claimant's impairments as non-severe at the Second Step was harmless error, because claimant was found to have other severe impairments, and the ALJ extensively discussed claimant's non-severe impairment symptoms in the Fourth Step); *Smolen*, 80 F.3d at 1290 (recognizing that, if one severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis). Thus, the question becomes whether the ALJ properly considered the functional limitations of all other medically determinable impairments at the remaining steps.

In the Fourth Step, the ALJ was required to account for Plaintiff's non-severe medically determinable impairments with regard to her ability to perform her past relevant work. *See id*. The ALJ found Plaintiff's fibromyalgia to be a medically determinable impairment which could cause her to suffer from the symptoms alleged. (AR 18, 24.) The ALJ only disagreed with "the intensity, persistence and limiting effects" of the impairment. (AR 25.) In determining a claimant's RFC, the ALJ should consider the claimant's ability to meet physical and mental

---

[5] Although the Court's finding with respect to the ALJ's discrediting of Plaintiff's testimony, which is more fully discussed below, could affect the determination of whether Plaintiff's fibromyalgia was severe, an error in this regard would also be harmless, as the ALJ resolved the Second Step in Plaintiff's favor and continued the sequential evaluation of Plaintiff's fibromyalgia, among her other impairments. *See, e.g., Lewis*, 498 F.3d 909; *Burch*, 400 F.3d at 682 ("Here, the ALJ did not find that Burch's obesity was a 'severe' impairment . . . Assuming without deciding that this omission constituted legal error, it could only have prejudiced Burch in step three (listing impairment determination) or step five (RFC) because the other steps, including this one, were resolved in her favor."); *but see* 20 C.F.R. §§ 404.1508, 416.908 (indicating that a claimant's statements of pain and symptoms, standing alone, would not be enough to establish a severe impairment).

demands, sensory requirements, and other functions. 20 C.F.R. §§ 404.1545(b)-(d), 416.945(b)-(d). The ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (AR 24.) In his consideration of Plaintiff's fibromyalgia, the ALJ thoroughly discussed Plaintiff's diagnoses and treatment. He mentioned that Plaintiff visited with her rheumatologist, Dr. H. Gill, during which Plaintiff "tested positive for tender points, consistent with fibromyalgia." (AR 20.) The ALJ discussed Plaintiff's visits with Dr. J.R. Grandhe, her pain specialist, during which Dr. Grandhe noted "the presence of trigger points," (AR 21), and "diagnosed [Plaintiff] with generalized body pain, possibly secondary to fibromyalgia" (AR 22), and Plaintiff's evaluation at Valley Health Team, during which Plaintiff was "diagnosed with . . . fibromyalgia muscle pain" (AR 22). Therefore, the ALJ considered Plaintiff's fibromyalgia in the Fourth Step of his analysis even though he found it to be non-severe. The ALJ's findings with regard to Plaintiff's fibromyalgia are accordingly supported by substantial evidence.

**B.      The ALJ's Consideration of Plaintiff's Credibility**

Plaintiff contends that the ALJ failed to articulate clear and convincing reasons for discrediting Plaintiff's testimony regarding the severity and extent of her pain and symptoms. (Doc. 16 at 21.) The Court disagrees with Plaintiff's position.

### 1.      Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, the ALJ must engage in a two-prong analysis. *Vasquez*, 572 F.3d at 591; *Bunnell*, 947 F.2d at 344. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Vasquez*, 572 F.3d at 591. The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [she] has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the

rejection. *Id.*

As to the second prong, "[t]he clear and convincing standard is 'not an easy requirement to meet' and it 'is the most demanding standard required in Social Security cases.'" *Wells v. Comm'r of Soc. Sec.*, No. 1:17-cv-00078-SKO, 2017 WL 3620054, at *6 (E.D. Cal. Aug. 23, 2017) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014)). "General findings are insufficient" to satisfy this standard. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted). "[R]ather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*; *see, e.g.*, *Vasquez*, 572 F.3d at 592 ("To support a lack of credibility finding, the ALJ [is] required to 'point to specific facts in the record which demonstrate that [the claimant] is in less pain than she claims.'" (quoting *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993))); *cf. Burrell*, 775 F.3d at 1138 (stating that the Ninth Circuit's "decisions make clear that [courts] may not take a general finding . . . and comb the administrative record to find specific" support for the finding).

### 2. The ALJ Properly Discounted Plaintiff's Testimony Regarding the Intensity, Persistence, and Limiting Effects of Her Physical Impairments.

The ALJ in the present matter found that Plaintiff's allegations were "not entirely credible." (AR 25.) The ALJ provided the following reasons for this finding: (1) Plaintiff "testified to chronic, severe pain throughout her body, despite scant objective clinical findings;" (2) Plaintiff's "active lifestyle . . . is inconsistent with such complaints;" and (3) Plaintiff's lack of "required surgery or hospitalization," and her lack of need for "an assistive device for ambulation" constituted conservative treatment. (AR 25.)

#### a. Conservative Treatment

First, Plaintiff contends that substantial evidence does not support the ALJ's findings, within the context of his credibility determination, that Plaintiff had a history of conservative treatment. (Doc. 16 at 22.) The Court disagrees with Plaintiff's position.

"The treatment [a claimant] received, especially when conservative, is a legitimate consideration in a credibility finding." *McKnight v. Comm'r of Soc. Sec.*, No. 1:12-cv-00726-AWI-JLT, 2013 WL 12073218, at *2 (E.D. Cal. Sept. 2013) (citing *Meanel v. Apfel*, 172 F.3d

1111, 1114 (9th Cir. 1999)). In other words, "[t]he conservative nature of [a] plaintiff's treatment provides a clear and convincing reason for rejecting [a] plaintiff's statements concerning the severity of her impairments." *Bifarella v. Colvin*, 51. F. Supp. 3d 926, 935 (E.D. Cal. 2014) (citing *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)); *see also*, *e.g.*, *Parra*, 481 F.3d at 751 ("[E]vidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment." (citation omitted)). "According to agency rules, 'the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.'" *Molina*, 674 F.3d at 1113 (quoting SSR 96-7p).

Here, the ALJ found Plaintiff's treatment to be conservative for the following reasons: (1) "the claimant has not required surgery or hospitalization, and does not require an assistive device for ambulation;" (2) "[t]he evidence does not show that the claimant has sought or received any mental health counseling or therapy;" and (3) "[t]he only treatment she has received, is prescriptions for Lorazepam from physicians who are not mental health specialists." (AR 25.) Plaintiff's pain management specialist, Dr. Grandhe, treated Plaintiff with an over-the-counter TENS unit, home therapy, and continued medication management, which included prescriptions of Plaquenil, Lorazepam, Medrol, Lyrica, and Methotrexate. (AR 48-51, 368-71, 473-74); *see also Johnson v. Shalala,* 60 F.3d 1428, 1432 (9th Cir. 1995) ("'Conservative treatment' has been characterized by the Ninth Circuit as, for example, 'treat[ment] with an *over-the-counter pain medication*'.") (quoting *Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir.2007)) (emphasis added)). Plaintiff responded positively to this treatment. (AR 48-51, 473-74). Prior cases in the Ninth Circuit have repeatedly found that treatment was conservative when the claimant's pain was adequately treated with over-the-counter medication and other minimal treatment. *See*, *e.g.*, *Carmickle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008) (treatment was conservative where claimant took only Ibuprofen to treat his pain); *Tommasetti*, 533 F.3d at 1040 (claimant's favorable response to physical therapy, anti-inflammatory medication, a TENS unit, and lumbosacral corset was conservative treatment).

The ALJ was therefore entitled to discount Plaintiff's credibility based on this conservative treatment and Plaintiff's positive response to it. *See Id.*

While Dr. Grandhe also treated Plaintiff with several rounds of epidural steroid injections—treatment which may be more aggressive—"courts have frequently found that the fact that Plaintiff has been prescribed narcotic treatment or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment *as a whole* was conservative, particularly when undertaken in addition to other, less invasive treatment methods." *Martin v. Colvin*, 2017 WL 615196, at *10 (E.D. Cal. Feb. 14, 2017) (emphasis in original) (citing *Huizar v. Comm'r,* 428 Fed. Appx. 678, 680 (9th Cir. 2011) (finding that plaintiff responded favorably to conservative treatment, which included "the use of narcotic/opiate pain medications"); *Zaldana v. Colvin*, No. CV 13–7820 RNB, 2014 WL 4929023, at *2 (C.D. Cal. Oct. 1, 2014) (finding that evidence of treatment including Tramadol, ibuprofen, and "multiple steroid injections" was "a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination because the record reflects that plaintiff was treated on the whole with conservative care for her foot pain with good results and improvement."); *Traynor v. Colvin*, No. 1:13–cv–1041–BAM, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014) (finding evidence that Plaintiff's symptoms were managed through "prescription medications and infrequent epidural and cortisone injections" was "conservative treatment" was sufficient for the ALJ to discount the plaintiff's testimony regarding the severity of impairment.); *Jones v. Comm'r of Soc. Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at *7-10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy, diminished plaintiff's credibility); *Higinio v. Colvin*, No. EDCV 12–1820 AJW, 2014 WL 47935, at *5 (C.D. Cal. Jan. 7, 2014) (holding that despite the fact that the claimant had been prescribed narcotic pain medication at various times, the claimant's overall treatment—which also included use of a back brace and a heating pad—was conservative); *Walter v. Astrue*, No. EDCV 09–1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discredited claimant's allegations

based on conservative treatment consisting of Vicodin, physical therapy, and an injection).

Further, as the ALJ stated, Plaintiff had no history of hospitalization, surgical intervention, assistive device for ambulation, or otherwise aggressive treatment. (AR 25); *see also*, *e.g.*, *Osenbrock v. Apfel*, 240 F.3d 1157, 1165–66 (9th Cir. 2001) (finding that the ALJ did not err in making an adverse credibility finding where the ALJ stated, in part, that "the claimant has not participated in any significant pain regimen or therapy program"); *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989) (finding that the ALJ did not err in making an adverse credibility finding because, in part, the claimant "alleged persistent and increasingly severe pain and discomfort," but "denied having received more than rather minimal conservative treatment for his various complaints").

Even if Plaintiff's treatment were considered conservative, remand would not be warranted because the remainder of the ALJ's credibility finding as set forth below were supported by ample evidence in the record. *See Batson v. Comm'r Soc. Sec.*, 359 F. 3d 1190, 1197 (9th Cir. 2004)) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion' such is deemed harmless and does not warrant reversal."); *Tonapetyan v. Halter,* 242 F. 3d 1144, 1148 (9th Cir. 2001) (that some reasons for discrediting claimant's testimony should be properly discounted does not render an ALJ's determination invalid so long as that determination is supported by other, substantial evidence). As such, the Court finds that the ALJ's credibility determination based on Plaintiff's conservative treatment was supported by substantial evidence.[6]

### b. Daily Activities

Plaintiff's further contends that "[t]he ALJ cites no evidence in the record, as is required, to support his conclusion that Ms. Brown is leading an 'active lifestyle.'" (Doc. 16 at 21.) The Court disagrees.

---

[6] The Court observes that although Plaintiff stopped seeing her pulmonologist, Dr. K. Gill, from 2011 until 2014 because of problems with her health insurance, she nevertheless continued receiving emergency room treatment for her asthma. (*See* AR 20.) Additionally, there does not appear to be any break in the treatment she was receiving from her other doctors.

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferrable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989)); see also *Molina*, 674 F.3d at 1112 ("While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.") (internal quotation and citations omitted). "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* (citations omitted).

At the hearing, Plaintiff testified that she was unable to work due to chronic, severe pain throughout her body, that she could walk only "maybe 40 minutes," could sit still for 25 minutes, and could stand for about an hour. (AR 58-60.) The ALJ found, however, that Plaintiff was able to engage in her normal daily activities despite her subjective complaints. (AR 25.) In particular, the ALJ found that Plaintiff was able to perform household duties, shop with the help of her children, cook for her children daily, lift a gallon of milk, drive, visit her brother, attend church, and care for her personal needs. (AR 19-21, 25.) This Court's recent order in *Martin v. Colvin*, 2017 WL 615196, at *11 (E.D. Cal. Feb. 14, 2017) is instructive. In that case, the claimant was able to run errands using public transportation, read, crochet, watch television, and perform such household chores as cooking, laundry, vacuuming, cleaning the bathtub and shower bench. *Id.* The Court found that such "activities tended to suggest that the claimant may have still been capable of performing the basic demands of unskilled work on a sustained basis." *Id.* Here, Plaintiff engaged in largely the same types of daily activities as the claimant in *Martin*. In addition to the general household chores mentioned by the ALJ, Plaintiff testified at the hearing that helps vacuum, mop, do the laundry, and that she sometimes wipes the counters. (AR 56-57.)

As such, the Court similarly finds that such activities tend to suggest that Plaintiff may still be able to perform, on a sustained basis, the basic demands of the light, unskilled jobs identified by the VE. *See Fair,* 885 F.2d at 603 (finding that if a claimant has the ability to

perform activities "that involved many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent her from working"); *see also*, e.g., *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband managing finances); *Morgan v. Comm'r Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999) (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility); *Kelly v. Astrue*, 471 F.App'x 674, 677 (9th Cir. 2012) (holding that ALJ properly made an adverse credibility finding because, in part, claimant's daily activities included driving, washing the dishes, shopping, and caring for her two children); *Garcia v. Colvin*, No. EDCV 14-2107 AGR, 2015 WL 5568606, at *6 (C.D. Cal. Sept. 22, 2015) (ALJ properly discredited subjective complaints of claimant who suffered from fibromyalgia and rheumatoid arthritis where claimant engaged in light daily activities such as house chores, cooking, vacuuming, mopping, cleaning walls, changing beds, and caring for husband and grandchild); *Ann Cox v. Colvin*, No. 15-cv-00190-JSC, 2015 WL 8596436, at *22 (N.D. Cal. Dec. 14, 2015) (finding ALJ's discrediting of claimant's subject complaints to be proper where claimant, who suffered from fibromyalgia and rheumatoid arthritis, performed household chores, shopped for groceries, performed personal care tasks without assistance, prepared full meals, and drove).

Further, the record shows that Plaintiff admitted that she could still engage in normal daily activities despite her alleged disabilities. When examined in July 2014, Plaintiff reported that the pain did not prevent her from engaging in normal activities. (AR 540); *see Martinez v. Comm'r Soc. Sec.*, 2017 WL 4284651, at *5 (E.D. Cal. Sept. 27, 2017) (upholding ALJ's credibility finding on the grounds, in part, that claimant admitted to a mental health examiner that her age rather than her alleged disabilities were preventing her from obtaining a job).

The record also contains some contrary evidence, such as Plaintiff's statements regarding her constant aches and pains, her inability to sit comfortably for more than 45 minutes, and her

need to lie down for an hour to get comfortable.  (AR 58-60.)  However, it is the function of the ALJ to resolve any ambiguities, and the Court finds the ALJ's assessment of Plaintiff's daily activities to be reasonable and supported by substantial evidence.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and noting that the ALJ's interpretation "may not be the only reasonable one").

### c.     Objective Medical Evidence

Finally, the Court disagrees with Plaintiff's argument that the ALJ erred in finding that the objective medical evidence did not support Plaintiff's subjective complaints.  (*See* Doc. 16 at 21.)

While subjective symptom testimony cannot be rejected solely on the ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining Plaintiff's credibility.  *Rollins*, 261 F.3d at 957 (citing 20 C.F.R. § 404.1529(c)(2)); *see Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("[L]ack of medical evidence . . . is a factor that the ALJ can consider in his credibility analysis.").

Here, the ALJ discounted Plaintiff's credibility because, in part, Plaintiff "testified to chronic, severe pain throughout her body, despite scant objective clinical findings."  (AR 25.) Contrary to Plaintiff's assertion, (*see* Doc. 16 at 19-22), the ALJ provided ample support for this conclusion, including an extensive discussion regarding the relevant medical evidence during the course of the RFC analysis, (*see* AR 19-22).  Plaintiff complained, for instance, that she "always ha[s] back pain . . . [t]hat doesn't go away," and that she is "always hurting."  (AR 47.) However, Dr. Quint, consultative examiner, made contradictory findings.  Dr. Quint determined that Plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently, could sit, stand, and walk six hours in an eight-hour workday, and could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (AR 121, 124.)  Dr. Grandhe, Plaintiff's pain management specialist, noted that Plaintiff suffered only mild degenerative changes of the cervical spine, without any significant spinal canal stenosis or neuroforaminal narrowing, spinal cord

compression, or nerve root impingement at any imaged level. (AR 369.) Plaintiff returned for a follow-up examination, and Dr. Grandhe noted an "excellent response for two weeks." (AR 373.) Dr. H. Gill, Plaintiff's rheumatologist, also noted that Plaintiff expressed "feel[ing] much better" following a round of treatment. (AR 473.) As the ALJ fully explored the pertinent medical evidence relating to the credibility determination, the Court finds that the ALJ's stated rationale pertaining to the objective medical evidence is a valid clear and convincing reason for the ALJ's adverse credibility finding. *See, e.g.*, *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (finding that the "ALJ gave specific, clear and convincing reasons for discounting [the claimant's] testimony" where the ALJ found, in part, that "no objective medical evidence" supported the claimant's "descriptions of her pain and limitations"); *Regennitter v. Commissioner*, 166 F.3d 1294, 1297 (9th Cir. 1998) (explaining that a determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement); *Bifarella*, 51 F. Supp.3d at 934–35 (finding that the ALJ's rationale relating to an inconsistency between the plaintiff's statements and the objective medical evidence was a valid clear and convincing reason for an adverse credibility finding where the ALJ addressed the pertinent evidence and reached an "interpretation of the objective evidence [that] was reasonable").

In summary, the Court finds that each of the ALJ's stated bases for his credibility determination are supported by substantial evidence. The Court therefore finds that substantial evidence supports the ALJ's ultimate credibility determination and, consequently, that reversal of the ALJ's decision is not warranted.

## VI.     CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is, therefore, AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   __**January 26, 2018**__                    _____/s/ *Sheila K. Oberto*_____

UNITED STATES MAGISTRATE JUDGE